1
2
3
4
5
6
7
8               **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10

11  GLENN BOSWORTH,                    Case No. CV 14-0498 DMG (SS)

12              Plaintiff,

13       v.                            **MEMORANDUM AND ORDER**

                                       **DISMISSING THIRD AMENDED**
14  UNITED STATES OF AMERICA, et
    al.,                               **COMPLAINT WITH LEAVE TO AMEND**
15
                Defendants.
16

17                                     **I.**

18                              **INTRODUCTION**

19

20       On June 23, 2016, Plaintiff Glenn Bosworth, a federal prisoner

21  proceeding pro se, filed the operative Third Amended Complaint

22  ("TAC") pursuant to Bivens v. Six Unknown Named Agents of the

23  Federal Bureau of Narcotics, 403 U.S. 388 (1971), and, ostensibly,

24  the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et

25  seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 790 et seq.

26  To date, each iteration of Plaintiff's Complaint has presented a

27  different mix of Defendants and claims reflecting Plaintiff's ever-

28  changing and expanding theories of liability.   None of the

Defendants named in Plaintiff's original Complaint is sued in the TAC, and two of the four currently-named Defendants were not named in <u>any</u> of the prior versions of Plaintiff's claims.  Furthermore, the claims have morphed from allegations of sexual abuse and excessive force to assertions of deliberate indifference to serious medical needs and, in the latest version, violations of statutes intended to protect the disabled.

This constant flux of Defendants and claims is an abuse of the Court's resources and will not be tolerated indefinitely. Instead of reviewing Plaintiff's amended complaints simply to ensure that Plaintiff corrected the deficiencies in the prior complaint, the Court must undertake a review of new claims against entirely different defendants based on entirely different legal theories.  The TAC is Plaintiff's fourth attempt to state a claim. The Court will permit Plaintiff <u>a fifth and final opportunity to a state civil rights claim</u>.  Plaintiff is expressly cautioned that if the allegations of the Fourth Amended Complaint do not state a claim, the Court will recommend that his claims be dismissed, in whole or in part, under Federal Rule of Civil Procedure 12(b)(6), without further amendment.  With this limitation, for the reasons stated below, the TAC is dismissed with leave to amend.[1]

Congress mandates that district courts initially screen civil complaints filed by a prisoner seeking redress from a government

---

[1] Magistrate Judges may dismiss a complaint with leave to amend without approval of the District Judge.  <u>See</u> <u>McKeever v. Block</u>, 932 F.2d 795, 798 (9th Cir. 1991).

1  entity or employee.  28 U.S.C. § 1915A(a).  This Court may dismiss

2  such a complaint, or any portions thereof, before service of

3  process   if   the   Court   concludes   that   the   complaint

4  (1) is frivolous or malicious, (2) fails to state a claim upon

5  which relief can be granted, or (3) seeks monetary relief from a

6  defendant   who   is   immune   from   such   relief.    28   U.S.C.

7  § 1915A(b)(1)-(2); see also Lopez v. Smith, 203 F.3d 1122, 1126-27

8  & n.7 (9th Cir. 2000) (en banc).

9

10                                  **II.**

11              **ALLEGATIONS OF THE THIRD AMENDED COMPLAINT**

12

13      Plaintiff   sues   the   following   four   prison   physicians:

14  (1) Jaspar Dahliwahl; (2) Richard Gross; 3) Jose Bueno; and

15  (4) Maria Dy.  (TAC at 4-5).  Dahliwahl, Gross, and Bueno were

16  employed during the relevant period at the Federal Correctional

17  Institution in Lompoc, California ("FCI-Lompoc"), where Plaintiff

18  was housed at the time of the injury alleged in the TAC.  Dy is

19  employed at the Federal Detention Center in Seattle, Washington

20  ("FDC-Seatac"), where Plaintiff was transferred approximately two

21  and one-half years after his injury.  Defendants are sued in their

22  individual capacity under Bivens and in their official capacity

23  under the ADA and the Rehabilitation Act.[2]  (Id.).

24

25  _____

[2] Official capacity claims are "in all respects other than name"
26  suits against the government entity. Kentucky v. Graham, 473 U.S.
    159, 166 (1985).   Accordingly, Plaintiff's claims against
27  Defendants in their official capacity are claims against the
    Federal Bureau of Prisons ("BOP"), i.e., the United States federal
28  government.

                                    3

On April 8, 2012, Plaintiff suffered an injury to his left wrist during a prisoner softball game at FCI-Lompoc. (Id. at 5). Dahliwahl examined Plaintiff on the day of the accident and concluded that he had suffered only a sprained wrist. (Id.). Plaintiff asked for an x-ray and was informed that he "might" be x-rayed later in the week. (Id. at 6). After enduring two days of "severe pain," on April 10, 2012, Plaintiff informed the medical staff of his ongoing pain and was given an x-ray, which showed that Plaintiff's wrist was broken. (Id.). That same day, Plaintiff was sent to an off-site medical facility for emergency surgery, which took place on April 11, 2012. (Id.).

Approximately two months after the operation, Plaintiff began noticing that his left hand and wrist would shake uncontrollably if he extended his arm, rotated his wrist, or raised his hand above his head. (Id.). In September 2012, FCI-Lompoc medical staff requested that Plaintiff be provided physical therapy. (Id.). In October 2012, a BOP radiology consultant diagnosed Plaintiff with "Disuse Osteopenia," an "irreversible medical condition" that Plaintiff alleges "must be treated immediately to interrupt its advancement."[3] (Id.). In November 2012, Plaintiff's outside surgeon diagnosed him with Reflex Sympathetic Dystrophy and

---

[3] Osteopenia is a "reduction in bone volume to below normal levels especially due to inadequate replacement of bone lost to normal lysis," i.e. the normal "process of disintegration or dissolution" of bone matter. See c.merriam-webster.com/medlineplus/osteopenia; http://c.merriam-webster.com/medlineplus/lysis. While Plaintiff was diagnosed with Osteopenia in October 2012, he states that he was not advised of the diagnosis until April 2015, some thirty months later. (TAC at 7).

1    recommended that he be seen by a neurologist "to provide a

2    sympathetic blockage."[4]  (Id.).

3

4        On July 16, 2013, Gross examined Plaintiff and made a

5    "provisional diagnosis" of Reflex Sympathetic Dystrophy.  (Id.).

6    Gross also told Plaintiff that the BOP had authorized an

7    examination by a neurologist.  (Id.).  On August 9, 2013, eleven

8    months after FCI-Lompoc medical staff had recommended that

9    Plaintiff be given physical therapy, Bueno denied the request.

10   (Id.).

11

12       Gross examined Plaintiff again on February 20, 2014 and noted

13   that Plaintiff's shaking had worsened.  (Id.).  Gross again

14   diagnosed Plaintiff with Reflex Sympathetic Dystrophy and told him

15   that he would soon be examined by a neurologist, which had not yet

16   occurred.  (Id.).  On April 3, 2014, an outside neurologist examined

17   Plaintiff, confirmed his Reflex Sympathetic Dystrophy diagnosis,

18   and told Plaintiff that his was the worst case of that condition

19   that he had ever seen.  (Id. at 8).

20

21       A few weeks later, on April 20, 2014, Gross recommended that

22   Plaintiff be authorized for a sympathectomy.  (Id. at 8).  On the

23   same date, Gross filed a "written medical order that a '770

24   ─────────────────────

25   [4] Plaintiff appears to be referring to a "sympathectomy."  A
     "sympathectomy" is a "surgical interruption of sympathetic nerve

26   pathways," see c.merriam-webster.com/medlineplus/sympathectomy,
     typically performed to decrease long-term pain by cutting or

27   removing the sympathetic ganglia, which are "collections of nerve
     cell bodies in clusters along the thoracic or lumbar spinal cord."

28   See www.surgeryencyclopedia.com/St-Wr/Sympathectomy.html.

5

transfer' (a medical transfer within the [FOB]) be initiated to transfer Plaintiff" to an appropriate facility for the procedure. (Id.). Dahliwahl approved Gross's sympathectomy recommendation on April 23, 2014.  (Id.).

On June 24, 2014, Gross reduced Plaintiff's "medical care level" from "Level 2" (chronic care or serious medical needs) to "Level 1" (normal status).  (Id. at 9).  In September 2014, Plaintiff was transferred to FDC-Seatac in Seattle, Washington, but not pursuant to a 770 transfer.

In the fall of 2014, medical staff at FDC-Seatac diagnosed Plaintiff with Osteopenia.  In April 2015, Dy told Plaintiff that he had Osteopenia, for which Plaintiff was prescribed Alendronate. (Id.). However, Dy did not tell Plaintiff that he had "degenerative joint disease" or that his Osteopenia had been diagnosed thirty months earlier (in October 2012) at FCI-Lompoc.  (Id.).  On May 1, 2015, Dy informed Plaintiff that he had been approved for "hand surgery." (Id. at 10).  However, Plaintiff has never received the surgery.  (Id.).

On June 11, 2015, Dy informed Plaintiff that he had been approved for a neurologist examination and for occupational therapy.  (Id.).  The neurologist confirmed Plaintiff's Reflex Sympathetic Dystrophy.  (Id.).  Plaintiff received only a "single 75 minute non-contact examination by an Occupational Therapist" on June 29, 2015.  (Id.).  The Occupational Therapist diagnosed Plaintiff with a 91% "Disability of the Arm, Shoulder, and Hand"

("DASH") score. (Id.).   Plaintiff contends that his DASH score worsened because had had not been provided physical therapy earlier. (Id.).   The Occupational Therapist recommended that Plaintiff receive occupational therapy for a six-week course. (Id.).   However, Dy denied the recommendation. (Id.).

Since April 2015, when Dy informed Plaintiff of his Osteopenia diagnosis, Plaintiff has had five seizures marked by severe chest pains and abnormally low blood pressure levels, even though his EKG results each time were normal. (Id. at 11-12).   Plaintiff maintains that the seizures are connected to the injury in his left arm and wrist. (Id. at 12).

Plaintiff raises six claims, each of which he alleges arises under Bivens, the ADA, and the Rehabilitation Act. (Id. at 13-16).   First, Plaintiff claims that Dahliwahl is liable for having failed to provide him with an x-ray until April 10, 2012, two days after his accident. (Id. at 13).   Second, Plaintiff alleges that Gross (at FCI-Lompoc) and Dy (at FDC-Seatac) are liable for having failed to prescribe "Alendronate for his then known and diagnosed serious medical need of Osteopenia." (Id.).   Third, Plaintiff alleges that Bueno is liable for having denied the FCI-Lompoc medical staff's request that Plaintiff receive physical therapy. Similarly, Plaintiff also alleges that Dy is liable for having denied the Occupational Therapist's recommendation that Plaintiff receive occupational therapy. (Id. at 14).

\\

\\

1    Fourth, Plaintiff alleges that Gross is liable for having

2 failed to ensure that Plaintiff was seen by a neurologist timely

3 (i.e., before his actual examination in April 2014), despite the

4 recommendations by Plaintiff's surgeon in November 2012 and by

5 Gross himself in July 2013 that he be so examined.  (Id. at 15).

6 Fifth, Plaintiff states that Dahliwahl and Gross are liable for

7 having failed to ensure that he be given a sympathectomy, which he

8 has still not received.  (Id.).  Sixth, Plaintiff generally claims

9 that Dahliwahl, Gross, Bueno and Dy are liable because they denied

10 or delayed the provision of necessary medication, physical therapy,

11 occupational therapy and a sympathectomy.  (Id. at 16).

12

13    Plaintiff seeks declaratory relief and an injunction requiring

14 the BOP to transfer him to a "medically qualified" facility and to

15 provide him with physical and/or occupational therapy.  (Id. at

16 17-18).  Plaintiff also seeks compensatory damages for his physical

17 and mental suffering; the loss of use of his left hand, wrist,

18 fingers and arm; the loss of future income; his future medical

19 costs; and the "loss of consortium to and from his son and

20 daughter."  (Id. at 18).  Plaintiff also seeks punitive damages.

21 (Id.).

22

23                            **III.**

24                         **DISCUSSION**

25

26    Pursuant to 28 U.S.C. § 1915A(b), the Court must dismiss

27 Plaintiff's Third Amended Complaint due to defects in pleading.

28 Pro se litigants in civil rights cases, however, must be given

1  leave to amend their complaints unless it is absolutely clear that
2  the deficiencies cannot be cured by amendment.  See Lopez, 203 F.3d
3  at 1128-29.  Accordingly, the Court grants Plaintiff one final
4  opportunity to correct the deficiencies in his claims, as indicated
5  below.

6

7  **A.    Plaintiff Fails To State A Claim Under The ADA**

8

9        Plaintiff alleges that each of his causes of action arises
10  under the ADA.  The ADA provides in relevant part that "no qualified
11  individual with a disability shall, by reason of such disability,
12  be excluded from participation in or be denied the benefits of the
13  services, programs, or activities of a public entity, or be
14  subjected to discrimination by any such entity."   42 U.S.C.
15  § 12132.  A "public entity" is defined as "(A) any State or local
16  government; (B) any department, agency, special purpose district,
17  or other instrumentality of a State or States or local government;
18  and  (C) the  National  Railroad  Passenger  Corporation,  and  any
19  commuter authority . . . ."  42 U.S.C. § 12131(1).

20

21        Because the ADA's definition of "public entity" encompasses
22  only state and local governments and their instrumentalities, it
23  is well settled that the "ADA does not provide a cause of action
24  against the federal government." Cty. of St. Louis v. Thomas, 967
25  F. Supp. 370, 376 (D. Minn. 1997); see also Beaird v. Gonzales,
26  495 F. Supp. 2d 81, 82 n.1 (D. D.C. 2007) (federal prisoners failed
27  to state a prison conditions claim under the ADA because the ADA
28  "does not apply to the federal government"); Wales v. Trung, 2009

1  WL 4906502, at *10 (D. Minn. Dec. 16, 2009) ("The ADA protects

2  qualified individuals with disabilities from being excluded from

3  participation in or the benefits of the services, programs, or

4  activities of a public entity, but it does not apply to an inmate

5  confined in a federal prison."); Bevil v. Lappin, 2012 WL 1409550,

6  at *4 (E.D. Ky. Apr. 23, 2012) ("While the ADA clearly applies to

7  state prisons, it does not apply to federal prisons or federal

8  entities, or to individuals . . . .") (internal citations omitted).

9  All of Plaintiff's claims against Defendants in their official

10 capacity are claims against the federal government.  Accordingly,

11 Plaintiff's claims under the ADA fail and must be dismissed.

12

13 **B.**   **Plaintiff Fails To State A Claim Under The Rehabilitation Act**

14

15     Plaintiff also alleges that each of his causes of action

16 arises under the Rehabilitation Act.  Similar to the ADA, the

17 Rehabilitation Act provides:

18

19     No otherwise qualified individual with a disability in

20     the United States, as defined in section 705(20) of this

21     title,[5] shall, solely by reason of her or his disability,

22     be excluded from the participation in, be denied the

23     benefits of, or be subjected to discrimination under any

24     program  or  activity  receiving  Federal  financial

25

26 [5] The Rehabilitation Act defines the term "individual with a
   disability" in relevant part as "any individual" who "has a
27 physical or mental impairment which for such individual constitutes
   or results in a substantial impediment to employment . . . ." 29
28 U.S.C. § 705(a).

assistance or under any program or activity conducted by
any Executive agency or by the United States Postal
Service.

29 U.S.C. § 794(a).  "To state a prima facie claim under the
Rehabilitation Act, a plaintiff must show: (1) he is a person with
a disability as defined by the statute; (2) he is otherwise
qualified for the benefit in question; (3) he was excluded from
the benefit due to discrimination based upon the disability; and
(4) the program or activity from which is excluded receives federal
financial assistance."  Wales, 2009 WL 4906502, at *10.

     Plaintiff's Rehabilitation Act allegations fail.  First, even
though Plaintiff states that he is unable to use his left arm, it
is not clear from the facts alleged that this is a qualifying
disability under the Rehabilitation Act.  Many courts have
concluded that a physical impairment is not a qualifying disability
where it merely prevents a plaintiff from performing a particular
job.[6]  See, e.g., Wooten v. Farmland Foods, 58 F.3d 382, 383 (8th
Cir. 1995) (hand impairment that interfered with plaintiff's
ability to perform a narrow range of meat packing jobs was not a
qualifying disability); Dutcher v. Ingalls Shipbuilding, 53 F.3d
723, 727-28 (5th Cir. 1995) (inability to use right arm due to gun
accident was not a qualifying disability where plaintiff failed to

---

[6] Cases interpreting the term "disability" under the ADA are
applicable to Rehabilitation Act cases and will be cited here.  See
Wooten v. Farmland Foods, 58 F.3d 382, 385 n.2 (8th Cir. 1995)
("The ADA defines disability substantially the same as the
Rehabilitation Act of 1973 . . . so cases interpreting either will
be instructive for this analysis.").

show that her impairment disqualified her from other jobs requiring similar training); Redlich v. Albany Law School of Union University, 899 F. Supp. 100, 106-07 (N.D. N.Y. 1995) (plaintiff who suffered a stroke and lost the use of his left leg, arm and hand did not have a qualifying "disability" where he still could qualify for several positions in the field in which he was previously engaged); Sorensen v. University of Utah Hospital, 194 F.3d 1084, 1087-88 (10th Cir. 1999) (multiple sclerosis was a cognizable physical impairment but not a qualifying "disability" because it did not prevent plaintiff from performing jobs for which she was qualified).  The TAC does not show that the injury to Plaintiff's left arm and wrist is a "qualifying disability" under the Rehabilitation Act.

Second, even if Plaintiff could qualify as an individual with a disability under the Rehabilitation Act, the TAC nowhere alleges that Plaintiff suffered discrimination because of his alleged disability.  Plaintiff's claims describe Defendants' alleged failure to provide adequate medical treatment, but do not allege that Defendants refused to allow Plaintiff to participate in a program or activity, or even declined to treat his injuries, because of his disability.  The failure to provide adequate medical treatment "does not fall within the provisions of the ADA or Rehabilitation Act."  Brown v. Baca, 2010 WL 316475, at *7 (C.D. Cal. Jan. 18, 2010); see also Alexander v. Tilton, 2009 WL 464486, at *7 (E.D. Cal. Feb. 24, 2009) (collecting cases and noting that "courts have found that the ADA and [the Rehabilitation Act] do not create a federal cause of action for prisoners challenging the

medical treatment provided for their underlying disabilities");
Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir. 2005) (ADA and
Rehabilitation Act claims "cannot be based on medical treatment
decisions"); Grzan v. Charter Hosp. of Northwest Indiana, 104 F.3d
116, 121-22 (7th Cir. 1997) ("Allegations of discriminatory medical
treatment do not fit into the four-element framework required by
section 504 [of the Rehabilitation Act].").

     Plaintiff's claims of inadequate care arise, if at all, under
Bivens.  As such, Plaintiff's claims under the Rehabilitation Act
fail and must be dismissed.[7]

---

[7] In addition to the deficiencies discussed above, Plaintiff's
Rehabilitation Act claims appear to suffer from other defects that
the Court need not reach at this time.  For example, several courts
have concluded that the Rehabilitation Act "does not provide a
cause of action for inmates in federal prisons." Inko-Tariah v.
Lappin, 2009 WL 8652932, at *1 (E.D. N.C. Apr. 1, 2009), aff'd,
346 F. App'x 915 (4th Cir. 2009); see also Brown v. Lamanna, 2008
WL 5396507, at *1 (4th Cir. 2008) (per curiam) (summarily affirming
dismissal of prison condition claims by federal prisoners under
the ADA and Rehabilitation Act, while allowing similar claims to
proceed under Bivens); Sarvis v. United States, 234 F.3d 1262, 2000
WL 1568230, *2 (2d Cir. Oct. 19, 2000) (federal prisoner's claim
"was properly dismissed because Congress has not waived the Federal
Government's sovereign immunity against awards of money damages
for [Rehabilitation Act] violations," with a narrow exception not
applicable to the BOP).  However, it is unnecessary for the Court
to reach this issue because even if federal prisoners could bring
claims under the Rehabilitation Act, which the Court does not and
need not address, the allegations in the TAC fail to state a claim.

Similarly, Plaintiff may not have sued the proper defendant for
his Rehabilitation Act claims.  Suits against employees in their
official capacity are suits against the institution for which they
work.  Graham, 473 U.S. at 166.  Several courts have found that
Rehabilitation Act claims under section 501 (i.e., 29 U.S.C.
§ 791), which prohibits workplace discrimination, must be brought
against the head of the agency, not the agency itself.  See Johnston
v. Horne, 875 F.2d 1415, 1418 & 1421 (9th Cir. 1989), overruled on
other grounds by Irwin v. Dep't of Veterans Affairs, 498 U.S. 89

C.   **Plaintiff Fails To State A Bivens Claim For Deliberate Indifference To Serious Medical Needs**

Plaintiff alleges that each of the Defendants was deliberately indifferent to his serious medical needs because they failed either to provide him with adequate care or to ensure that he obtained adequate care timely.  (TAC at 13-16).  All of Plaintiff's deliberate indifference allegations are defective, in whole or in part.

\\

\\

_____

(1990), (in claims of disability discrimination in federal employment, section 501 of the Rehabilitation Act is the exclusive remedy and the head of the employing agency is the proper defendant); Bowen v. Post Master Gen., 2014 WL 1270546, at *4 (E.D. Cal. Mar. 26, 2014) ("[A]n employment discrimination suit under Section 501 must designate the 'head of the department, agency, or unit' as the party defendant.").  However, "a distinction exists" between section 501, which "obligates federal employers to provide reasonable accommodation for the handicapped and to develop and implement affirmative action plans for handicapped employees" and section 504 (i.e., 29 U.S.C. § 794), which "prohibits the exclusion of 'otherwise qualified individuals' from government activities or programs receiving federal funds 'solely by reason of their handicap.'"  Johnston, 875 F.2d at 1418 (quoting Mantolete v. Bolger, 767 F.2d 1416, 1421 (9th Cir. 1985)).  In contrast to employment discrimination claims under section 501, "[c]ourts are split as to whether . . . [the] government itself is a proper defendant in a section 504 Rehabilitation Act claim."  Alford v. City of Cannon Beach, 2000 WL 33200554, at *26 (D. Or. Jan. 17, 2000); see also Maat v. Cty. of Ottawa, 2014 WL 1255981, at *7 (W.D. Mich. Mar. 26, 2014) (citing Alford).  Because the Court finds that Plaintiff does not and cannot allege a Rehabilitation Act claim on substantive grounds, it need not address whether Plaintiff has named a proper defendant for those claims by suing Defendants in their official capacity, instead of suing the head of the BOP.

1  **1. Standard**

2

3   A defendant is liable for the delay or denial of a prisoner's

4 medical care in violation of the Eight Amendment only when the

5 defendant is deliberately indifferent to the prisoner's known

6 serious medical needs. <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th

7 Cir. 2006); <u>see</u> <u>also</u> <u>West v. Atkins</u>, 487 U.S. 42, 49 (1988). A

8 prisoner must show that the deprivation he suffered was

9 "objectively, sufficiently serious" and that prison officials were

10 deliberately indifferent to his safety in allowing the deprivation

11 to take place, resulting in harm to the plaintiff. <u>Morgan v.</u>

12 <u>Morgensen</u>, 465 F.3d 1041, 1045 (9th Cir. 2006). The defendant must

13 have "purposefully ignore[d] or fail[ed] to respond to a prisoner's

14 pain or possible medical needs in order for deliberate indifference

15 to be established." <u>May v. Baldwin</u>, 109 F.3d 557, 566 (9th Cir.

16 1997) (internal quotation marks omitted). "[M]ere malpractice, or

17 even gross negligence," in the provision of medical care does not

18 establish a constitutional violation. <u>Wood v. Housewright</u>, 900

19 F.2d 1332, 1334 (9th Cir. 1990). In addition, "[a] difference of

20 opinion [in the form or method of treatment] does not amount to a

21 deliberate indifference [of plaintiff's] serious medical needs."

22 <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989).

23 \\

24 \\

25 \\

26 \\

27 \\

28 \\

1        **2.   Dahliwahl**

2

3        Plaintiff alleges that Dahliwahl[8] is liable because he failed

4    to take an x-ray of Plaintiff's injuries until two days after the

5    accident (Claim One), and to ensure that Plaintiff was given a

6    sympathectomy after approving the procedure request on April 23,

7    2014 (Claim Five).  Neither of these claims, as alleged, states a

8    claim against Dahliwahl for deliberate indifference.

9

10       Dahliwahl's failure to order an x-ray immediately after

11   Plaintiff's accident was, at most, negligence, which is not

12   actionable under the Eighth Amendment.  Plaintiff does not allege

13   facts showing that Dahliwahl knew that Plaintiff's wrist was broken

14   -- or even that it was likely to be broken -- when he first examined

15   Plaintiff and that despite that knowledge, deliberately chose not

16   to treat the injury.  See Wilhelm v. Rotman, 680 F.3d 1113, 1123

17   (9th Cir. 2012) (a "negligent misdiagnosis" does not state a claim

18   for deliberate indifference).

19

20       Similarly, Dahliwahl's alleged failure to ensure that

21   Plaintiff received a sympathectomy, which Dahliwahl himself

22   approved, does not show deliberate indifference on the facts

23   alleged.  Plaintiff contends that Dahliwahl authorized the

24   procedure at the end of April 2014, approximately four months

25   before Plaintiff's transfer to FDC-Seatac in Seattle.  (TAC at 8-

26   9).  The Ninth Circuit has recognized that an "unnecessary delay

27   _____

28   [8] Dahliwahl was not a named Defendant in any prior version of
     Plaintiff's claims.

in administration of prescribed treatment can amount to deliberate indifference." Wilhelm, 680 F.3d at 1123 n.8.  In Wilhelm, for example, the court found that a prisoner stated a deliberate indifference claim where he alleged that the defendant physician had "repeatedly" concluded that referral to surgery was necessary but failed to request the referral properly, thereby delaying operation for "more than a year."  Id. at 1123.  However, in that case, plaintiff's allegations "and exhibits, taken as true, demonstrate[d] that the delay was attributable to [the physician's] failure to request the referral properly and, more troublingly, his inexplicable cancellation of a second referral request." Id. Here, Plaintiff merely alleges that Dahliwahl approved a sympathectomy, but does not show how Dahliwahl's actions or inaction were the reason (or even a reason) why Plaintiff did not receive a sympathectomy at FCI-Lompoc in the four months before his transfer to FDC-Seatac.  Accordingly, Plaintiff's claims against Dahliwahl must be dismissed, with leave to amend.

### 3.  Gross

Plaintiff contends that Gross is liable because he failed to (1) prescribe Alendronate for Plaintiff's Osteopenia (Claim Two); (2) ensure that Plaintiff was examined by a neurologist before April 2014, i.e., two years after his injury (Claim Four); and (3) ensure that Plaintiff be given a sympathectomy (Claim Five). None of these claims, as alleged, states a claim against Gross for deliberate indifference.

1    Plaintiff's allegation that Gross was "deliberately
2  indifferent" because he did not prescribe Alendronate for his
3  Osteopenia fails to state a claim.  Plaintiff alleges that the
4  BOP's radiology consultant diagnosed him with "Disuse Osteopenia"
5  in October 2012, but nowhere does he allege that Gross was informed
6  of this diagnosis or reached the same diagnosis himself, or that
7  Gross knew that Plaintiff required Alendronate but deliberately
8  chose not to prescribe it or any other medication.  (TAC at 6).
9  None of the TAC's allegations concerning Gross reflect that Gross
10  had <u>any</u> involvement with the diagnosis or treatment of Plaintiff's
11  bone loss, as opposed to Plaintiff's neurological disorders.  Nor
12  has Plaintiff alleged any connection between those disorders.

13

14    Similarly, Plaintiff fails to state a deliberate indifference
15  claim against Gross for Gross's alleged failure to provide "an
16  examination by a neurologist for 17 months after it had been
17  recommended in writing by the FBOP contract surgeon and for 9
18  months after Defendant Gross also recommended in writing that such
19  a neurological examination be provided." (TAC at 15).  Plaintiff
20  does not allege that Gross even knew of the surgeon's November 20,
21  2012 recommendation or explain why Gross was responsible for acting
22  on the surgeon's recommendation.  Nor does Plaintiff explain what
23  Gross did or did not do after informing Plaintiff in July 2013 that
24  the BOP had approved a neurologist consultation that <u>caused</u> the
25  delay in the examination.

26

27    Finally, Plaintiff's claim that Gross was deliberately
28  indifferent because he did not ensure that Plaintiff was provided

18

with a sympathectomy also fails.  Plaintiff alleges that on April 20, 2014, shortly after Plaintiff was examined by an outside neurologist who recommended that Plaintiff be given a sympathectomy, Gross <u>agreed with</u> the neurologist's recommendation and "<u>made his own written recommendation to the Medical Committee at FCI-Lompoc</u>" that Plaintiff be given a Symphathectomy, which Dahliwahl approved on April 23, 2014.  (TAC at 8).  Like Plaintiff's claim against Dahliwahl, Plaintiff does not show how Gross's actions or inaction were the reason (or even a reason) why Plaintiff did not receive a sympathectomy before being transferred from FCI-Lompoc to FDC-Seatac four months after Gross submitted his recommendation.

Plaintiff's claims against Gross generally fail to show that Gross was deliberately indifferent to Plaintiff's serious medical needs.  Accordingly, Plaintiff's claims against Gross must be dismissed, with leave to amend.

**4.   Bueno**

Plaintiff claims that Bueno[9] is liable because on August 9, 2013, he wrongfully denied a medical staff request that Plaintiff be approved for physical therapy, which had been submitted eleven months earlier (Claim Three).  This claim, as alleged, does not state a claim for deliberate indifference against Bueno.

---

[9] Bueno was not a named Defendant in any prior version of Plaintiff's claims.

1    The TAC does not allege any facts showing that Bueno knew of

2    Plaintiff's need for physical therapy but deliberately disregarded

3    the serious risk of harm to Plaintiff's health that the denial of

4    the physical therapy request would create.  At most, Plaintiff's

5    claim shows nothing more than a disagreement between Bueno, who

6    was the FCI-Lompoc clinical director, and the physician's assistant

7    who submitted the request as to Plaintiff's need for physical

8    therapy.  Accordingly, Plaintiff's claims against Bueno must be

9    dismissed, with leave to amend.

10

11       **5.    Dy**

12

13       Plaintiff maintains that Dy is liable because she, like Gross,

14   failed to prescribe Alendronate for Plaintiff's Osteopenia (Claim

15   Two), and, similar to Bueno, wrongfully denied Plaintiff's request

16   for occupational therapy (Claim Three).  Neither of these claims,

17   as alleged, states a claim against Dy for deliberate indifference.

18

19       Plaintiff's claim against Dy for failing to prescribe

20   Alendronate is difficult to understand.  Plaintiff's first

21   substantive mention of Dy states that "Plaintiff was finally

22   informed by Defendant Dy during April of 2015 that he had Osteopenia

23   . . . and was thereafter also prescribed and provided Alendronate."

24   (TAC at 9).  It is not clear whether Dy or some other staff member

25   prescribed Alendronate, or when the prescription issued.

26   Furthermore, nothing in Plaintiff's allegations suggests that Dy

27   knew that Plaintiff needed an Alendronate prescription but

28   intentionally refused to provide one.  Similarly, Plaintiff's

1  allegation that Dy wrongfully denied the Occupational Therapist's

2  request that Plaintiff be authorized for six weeks of occupational

3  therapy does not state a deliberate indifference claim.  Plaintiff

4  does not state when Dy denied the request, or allege facts showing

5  that Dy knew that it was medically necessary that he receive

6  occupational therapy, but intentionally refused to approve it,

7  despite the serious risk to Plaintiff's health.  Accordingly,

8  Plaintiff's claims against Dy must be dismissed, with leave to

9  amend.

10

11  **D.    The TAC Violates Federal Rule Of Civil Procedure 8**

12

13     Federal Rule of Civil Procedure 8 requires that a complaint

14  contain "'a short and plain statement of the claim showing that

15  the pleader is entitled to relief' in order to 'give the defendant

16  fair notice of what the . . . claim is and the grounds upon which

17  it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

18  Each claim must be simple, concise, and direct.  Fed. R. Civ. P.

19  8(d)(1).  Rule 8 can be violated when "too much" or "too little"

20  is said.  Knapp v. Hogan, 738 F.3d 1106, 1109 (9th Cir. 2013).

21

22     The TAC does not fully comply with Rule 8.  For example, Claim

23  Six appears to be nothing more than a general summation, alleged

24  simultaneously against all Defendants without differentiation, of

25  the allegations in Claims One through Five.  It is unclear whether

26  Plaintiff is attempting to allege something new against any

27  particular Defendant in Claim Six that was not already alleged in

28  Claims One through Five.  Therefore, the TAC fails to provide

Defendants with fair notice of the claims against them in a short, clear and concise statement.  <u>See</u> <u>Twombly</u>, 550 U.S. at 555. Accordingly, the TAC must be dismissed, with leave to amend.

**IV.**

**CONCLUSION**

For the reasons stated above, Plaintiff's Third Amended Complaint is dismissed with leave to amend.  If Plaintiff still wishes to pursue this action, he is granted **thirty (30) days** from the date of this memorandum and Order within which to file a Fourth Amended Complaint.  In any amended complaint, Plaintiff shall cure the defects described above.  **Plaintiff shall not include any new Defendants.**

**Furthermore, Plaintiff shall omit any claims or allegations that are not reasonably related to the claims asserted in the Third Amended Complaint but shall instead attempt to cure the deficiencies addressed in this Order.**  The Fourth Amended Complaint, if any, shall be complete in itself and shall bear both the designation "Fourth Amended Complaint" and the case number assigned to this action.  It shall not refer in any manner to the original or any prior version of the Complaint.

In any amended complaint, Plaintiff should confine his allegation to the operative facts supporting each of his claims. Plaintiff is advised that pursuant to Federal Rule of Civil Procedure 8(a), all that is required is a "short and plain statement

of the claim showing that the pleader is entitled to relief." **Plaintiff is strongly encouraged to utilize the standard civil rights complaint form when filing any amended complaint, <u>a copy of which is attached</u>.** In any amended complaint, Plaintiff should identify the nature of each separate legal claim and make clear what specific factual allegations support his claims. Plaintiff is strongly encouraged to keep his statements concise and to omit irrelevant details. It is not necessary for Plaintiff to cite case law or include legal argument.

**Plaintiff is explicitly cautioned that failure to timely file a Fourth Amended Complaint, or failure to correct the deficiencies described above, will result in a recommendation that this action be dismissed with prejudice for failure to prosecute and obey Court orders pursuant to Federal Rule of Civil Procedure 41(b). <u>Plaintiff is further advised that if he no longer wishes to pursue this action, he may voluntarily dismiss it by filing a Notice of Dismissal in accordance with Federal Rule of Civil procedure 41(a)(1). A form Notice of Dismissal is attached for Plaintiff's convenience</u>.**

DATED:  August 5, 2016


                                     /S/
                              SUZANNE H. SEGAL
                              UNITED STATES MAGISTRATE JUDGE



**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.**

23